Pennsylvania Crime Commission *v.* Nacrelli.
Pennsylvania Crime Commission *v.* McNichol.
Pennsylvania Crime Commission *v.* Eyre.
Pennsylvania Crime Commission *v.* Dickey.

552

Argued January 6, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Russell M. Coombs,* Deputy Attorney General, for petitioner.

*Melvin Levy,* with him *Levy and Levy,* for respondent, Nacrelli.

*Robert E. J. Curran,* with him *Kassab, Cherry, Curran and Archbold,* for respondent, McNichol.

*Vincent Labrasca,* with him *Fronefield, deFuria and Petrikin,* for respondent, Eyre.

*Alvin S. Ackerman,* for respondent, Dickey.

*Carmen P. Belefonte,* with him *John W. Nilon, Jr.,* and *Kassab, Cherry, Curran and Archbold,* of counsel for respondents.

OPINION BY JUDGE KRAMER, May 2, 1972:

This case comes before us within the purview of the original jurisdiction of this Court, granted by Section 401(a)(2) of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P. L. 673, 17 P.S. §211.401 (a)(2).

The matter was instituted in this Court by the filing of a Petition for a Rule to Show Cause why the four Respondents herein should not be ordered to testify before the Pennsylvania Crime Commission (Commission). An Answer containing New Matter was filed by each of the Respondents to the Commission's Petition. Thereafter Stipulations of Fact were entered into between each of the Respondents and the Commonwealth, and were filed with this Court. Each Stipulation contains a statement wherein the parties agreed that the Stipulations contain all matters of fact the parties deem necessary for this Court to make a determination on whether each of the Respondents should be ordered by this Court to appear before the Crime Commission for the purpose of testifying in response to a Subpoena issued by the Commission to each of the Respondents.

The Stipulations are extensive. Although the Stipulations for Respondents John H. Nacrelli, Joseph L.

Eyre and Samuel R. Dickey are identical, the Stipulation for Respondent Harry A. McNichol differs somewhat from the others. We adopt the Stipulation of Facts as this Court's Findings of Fact, and we set forth, in substance, those findings in the following enumerated paragraphs, which have been subdivided so as to show the differences between the sets of Stipulations.

## FINDINGS OF FACT

As related to Respondents *Nacrelli, Eyre and Dickey,* we find the following facts:

1. The Commission is conducting an investigation, which the Commission asserts to be under the authority of the Act of July 31, 1968, P. L.     (Act No. 235), 71 P.S. Sections 62, 179 and 307-7. The Commission seeks to investigate organized and other criminal activities, their prevention and control; the administration of justice, criminal infiltration and operation of businesses; and the relationship among persons involved in criminal activities, public officials and private associations, in Pennsylvania and, in particular, in the City of Chester, the County of Delaware generally, and surrounding areas.

2. A public hearing was held by the Commission on September 8, 1971 (First Hearing), at the Sheraton Hotel in Philadelphia. This hearing was held in a large hall attended by and with facilities for television, radio, cameramen, press and reporter coverage, and with the public invited and attending. At this hearing, the Commission proceedings commenced with a statement by its Chairman that the Commission was holding hearings upon charges of protected gambling operations and bail-bond racketeering in Delaware County.

3. On or about September 24, 1971, Commission agents served the Respondents with subpoenas* duly

---

* The body of the subpoenas, inter alia, read as follows: "We command you, pursuant to the authority of the Act of April 9,

issued by the Commission. (Copies of those subpoenas and affidavits of their service are attached to the respective petitions as exhibits.)

4. The subpoenas sought the personal appearances of the Respondents before the Commission on October 4, 1971 (Second Hearing), at the Villanova University Law School, to testify in a hearing to be held by the Commission as part of the said investigation.

5. On October 4, 1971, the Commission held a hearing at the time and location specified, in furtherance of the investigation, but the Respondents failed to appear. The attorneys who represent them in this Court appeared, stated they represented the Respondents, and that Respondnts would not appear at the hearing.

6. Preceding the said Second Hearing, the Commission had privately interviewed informers and proposed witnesses, in some instances without the knowledge and in no instance with the participation of the Respondents.

7. Preceding the said Second Hearing, the Commission had held private hearings, in some instances without the knowledge and in no instance with the participation of the Respondents, at which times sworn testimony was taken relating to alleged criminal conditions in Delaware County, allegedly involving the Respondents, but none of such testimony is available to Respondents upon request, in this case.

---

1929, P. L. 177, as amended by the Act of July 31, 1968, No. 235, that laying aside all business and excuse whatsoever you be and appear in your proper person before the Pennsylvania Crime Commission at Villanova University Law School, Room No. 103, First Floor, Gorly Hall, corner of Rt. 320 and County Line Road, Villanova, Pennsylvania, in the County of Delaware on the 4th day of October, 1971, at the hour of 9:30 o'clock a.m., to testify to the truth and give evidence concerning criminal activities, their prevention and control, the administration of justice, and relationships among persons involved in criminal activities, public officials and private associations, in Pennsylvania."

8. Before and after the said Second Hearing, the Chairman and attorneys of the Commission made statements to the press, knowing that the same might be published in metropolitan and suburban newspapers and throughout Delaware County.

9. The Commission scheduled and held a public hearing in a moot court room at Villanova Law School on October 4, 1971. The Commission purported to subpoena the Respondents to appear at the said hearing. The Respondents were given no notice of the purpose of their appearance nor the basis or scope of their proposed interrogation except to the extent, if any, that such notice was given in the subpoenas and the preliminary statement of the Chairman which had preceded the hearing of October 4, 1971.

10. The said Second Hearing was attended by and with facilities for television, radio, cameramen, press and reporter coverage and with the public invited and attending.

11. At the said Second Hearing, the Commission commenced its proceedings with the statement by its Chairman referred to above, said statement being made in the presence of television, radio and press representatives.

12. The Commission in some instances has held private hearings when it has taken testimony from alleged informers.

The Stipulation between the Commission and Respondent *McNichol* was substantially the same insofar as the twelve findings of fact set forth above are concerned. Therefore, all twelve of those findings are included in the findings of fact as they relate to Respondent McNichol. In addition to those twelve findings, the following additional findings are necessary, as they relate to Respondent McNichol.

13. Private hearings were held by the Commission on August 11, 12, 18, 19, 30 and October 1, 1971, for

the purpose of hearing witnesses relating to the Delaware County investigation.

14. Prior to these hearings (paragraph 13 above), most witnesses had been privately interviewed to determine what information they had relevant to the Commission's investigation. Some witnesses were invited to attend, and others were subpoenaed.

15. The testimony produced at the private hearings was not made available to the public at large, but the substance of some parts subsequently appeared in the news media.

16. The news media reported the witnesses' testimony as relating to gambling operations and bail-bond racketeering in the County of Delaware.

17. McNichol's name was not mentioned by any witness in either the private or public hearings.

McNichol was not interviewed prior to his being subpoenaed on September 24, 1971, for a public hearing, nor has he been interviewed since.

18. The fact that McNichol was subpoenaed was released to the press and appeared on the front pages of certain Sunday newspapers.

19. McNichol was then a candidate for reelection as a County Commissioner in the general election to be held on November 2, 1971.

20. McNichol, through his attorney, sent notice on September 29, 1971, by telegram, to the Attorney General stating his intention to appear in Commonwealth Court Chambers on September 30, 1971, to present a Petition to Quash the subpoena. That afternoon the attorney was called by a member of the press inquiring into the reason for and contents of the said Petition.

21. On the morning of September 30, 1971, before such time as the Petition was filed, the Philadelphia Inquirer printed a front-page story, relating to the said Petition to Quash, and quoted the Attorney General's

Office as characterizing the Petition as a "delaying tactic."

22. Prior to his appearance in Chambers on September 30, 1971, McNichol's attorney was met by television, radio and press representatives. Television coverage was given, on the three major television stations in the metropolitan Philadelphia area, to McNichol's attorney and McNichol (who was not present), with a filmed account of the filing of McNichol's Petition to Quash the subpoena.

23. Upon appearing at the Villanova University Law School on October 4, 1971, McNichol's attorney was again encountered by television, radio and press representatives. Television coverage was again given by the three major television stations to McNichol's attorney and McNichol (who was not present), with a filmed account of the assertion of McNichol's alleged Constitutional rights.

24. In most instances the Commission conducts private interviews and holds private hearings to determine whether the testimony of a proposed witness is relevant to their investigation.

### DISCUSSION

All four cases were joined for argument, and all four Respondents filed one joint Brief. The Respondents present three arguments to this Court. First, they argue that the statute, Act of July 31, 1968, P. L. (Act No. 235), amending the Administrative Code, Act of April 9, 1929, P. L. 177, 71 P.S. §§62, 179 and 307, which created the Pennsylvania Crime Commission, is an unconstitutional delegation of legislative power. Secondly, Respondents assert that the Commission exercises accusatory powers and therefore must follow the accepted standards of due process of law under the Constitution applicable to accusatory proceedings. Thirdly, Respondents argue that to enforce a subpoena

ad testificandum the Commission has a burden to show that the requested testimony of Respondents is pertinent and materially relevant to its investigation.

Prior to a discussion and disposition of the issues presented, we first must determine the nature of the Commission. It was established as an administrative commission within the Department of Justice (71 P.S. 62). Its membership consists of the Attorney General, who serves as Chairman, and four additional Commissioners appointed by the Governor (71 P.S. 179(a)).

Section 923 of the Administrative Code, *supra,* 71 P.S. 307-7, sets forth the powers and duties of the Commission, which include the following:

"The Pennsylvania Crime Commission shall have the power and its duty shall be:

"(1) To inquire into the causes of crime and delinquency, measures for their prevention, the adequacy of law enforcement and the administration of justice.

"(2) To develop standards and make recommendations for actions which may be taken by the State and local governments to prevent, reduce and control crime and increase respect for law, including, but not limited to, improvements in training of law enforcement personnel, improvements in techniques, organization and administration of law enforcement activities, improvements in the administration of justice, and rehabilitation techniques.

"(3) To investigate all crime generally, and shall have the power to investigate specifically but not limited to any relationship between any combination of persons involved in the commission of crimes on one hand, and any government or political unit, or any association, organization, trade business constituting a part or, doing business within the Commonwealth, and to gather evidence of the existence of organized or syndicate crime in the Commonwealth.

"(4) To investigate all fields of organized or syndicate crime.

"(5) To carry out continued research and planning to improve the quality of criminal justice.

"(6) To make a detailed written report of every completed investigation which may include recommendation for legislative or administrative action."

The Commission was given authority under the Statute to issue subpoenas in connection with its investigations which at 71 P.S. §307-7(9) reads as follows: "To require the attendance and testimony of witnesses and the production of documentary evidence relative to any investigation which the commission may conduct in accordance with the powers given it. Such subpoenas shall be signed by the chairman, the executive director and two commissioners and shall be served by any person authorized to serve subpoenas under the laws of the Commonwealth. Upon failure of any person, so ordered to testify or to produce evidence, the Commission may invoke the aid of any Court of Common Pleas of the county wherein the person is summoned to appear or the county wherein the person is served with a subpoena."

The concurrent jurisdiction of this Court with that of the Common Pleas Courts, under the provisions of the Appellate Court Jurisdiction Act, *supra*, 17 P.S. §211.502(a)(2) was determined by the Pennsylvania Supreme Court in the recent case of *In Re: The Petitions of the Pennsylvania Crime Commission*, et al., not yet reported, but filed December 29, 1971 (at Nos. 11, 12, 14 and 15 May Term, 1972), affirming this Court's Opinion at 2 Pa. Commonwealth Ct. 650 (1971).

## DELEGATION OF POWERS

The concept of the investigative powers of government is one of long standing.* It goes uncontroverted

---

* The evolutional history of legislative and executive investigatory bodies and agencies is set forth in the work of Kenneth Culp

that one of the legitimate areas for investigation is in the field of criminal activites, including those in government. *See* the reports of the President's Commission on Law Enforcement and Administrative Justice. *The Challenge of Crime in a Free Society,* 198, 207, and *Task Force Report: Organized Crime,* 14 23 (1967).

Significantly the Respondents do not question (1) the power of the General Assembly to investigate in the fields of crime and criminal justice for legislative purposes, or (2) that the General Assembly has investigative and fact-finding powers as part of its legislative function, or (3) that the Legislature can constitutionally organize a committee or agency to conduct investigative and fact-finding activities. The Respondents argue, however, that the powers granted by the Legislature to this Commission contain no "meaningful statutory standards," and thereby permit the Commission

Davis, entitled "Administrative Law Treatise," and at 1 Davis, *Administrative Law Treatise,* 160 (1958), we find the following language:

"Investigations are useful for all administrative functions, not only for rule making, adjudication, and licensing, but also for prosecuting, for supervising and directing, for determining general policy, for recommending legislation, and for purposes no more specific than illuminating obscure areas to find out what if anything should be done.

"The story of the development of the administrative power of investigation is rather dramatic. As regulation has expanded and intensified, the administrative quest for facts and more facts has gained momentum and has seemingly become an irresistible force. This force has collided with what at first were apparently immovable constitutional principles concerning privacy, searches and seizures, self-incrimination, and freedom from bureaucratic snooping. The constitutional principles remained firm for a time but gradually weakened and crumbled. The force proved irresistible. Remnants of the constitutional principles are left standing, but only to an extent clearly consistent with permitting administrative agencies freely to secure factual materials needed to carry out the programs they administer."

to conduct its investigations without any legislative control of its discretionary power. The Respondents state that there are no safeguards provided, by the Legislature (or by the Commission through its rules and regulations), for witnesses through which they may protect their constitutional rights. Respondents argue that under the description of the powers of the Commission a witness is unable to prepare or protect himself before entering into the carnival-like public arena of a hearing called by the Commission before the television cameras and other electronic devices of the news media.

In connection with Respondents' first argument that there was an unconstitutional delegation of powers, the burden is on the Respondents to prove same. The cases cited by Respondents are, for the most part, cases in which questions were raised concerning subpoenas duces tecum, by witnesses, during the hearing, which are not necessarily relevant to the issues in this case. In this case we are concerned with subpoenas ad testificandum, where the Respondents have refused to appear at a hearing to answer any questions. Our Supreme Court in the case of *Annenberg v. Roberts,* 333 Pa. 203, 210-11, 2 A. 2d 612, 616 (1938), conclusively established the principles that the Legislature may delegate its powers to investigate into an area wherein it has legitimate legislative purposes, and may grant the power to issue subpoenas. The Court there said: "Certainly committees or commissions may be created by a legislative body to investigate subjects upon which legislation may properly be enacted, and neither the functioning of such a commission nor the grant to it of the right to issue subpoenas constitutes a delegation by the general assembly of its power to make laws in violation of Article II, Section 1, of the State Constitution. It has been an almost continuous practice of successive legislatures to create such commissions, composed in whole

or in part of persons not members of the legislature, but, nevertheless, with the power to issue subpoenas for the attendance of witnesses and the production of books and papers."

Respondents cite *Watkins v. United States,* 354 U.S. 178 (1957), as authority for their argument that the delegation of powers to the Commission is unconstitutional due to its vagueness and lack of standards. We cannot agree. The *Watkins* case dealt primarily with the question of the protection to be afforded a witness before a Congressional committee, who objects and refuses to answer a question on grounds of pertinency. This argument of Respondents was completely and specifically considered and rejected by the United States Supreme Court in the case of *Barenblatt v. United States,* 360 U.S. 116 (1959), where the same argument was made, when the Court said, "The Watkins' case cannot properly be read as standing for such a proposition."

Furthermore, the vagueness spoken of in *Watkins* had to do with the indefinite term "un-American activities." Here we are dealing with such terms as "crime" and "criminal activities" which have definite meanings as specifically defined in the statutes of this Commonwealth.

Respondents also assert that the statute creating the Commission failed to set forth "guidelines as to what the Commission is to do with the power delegated. . . ." This argument is non-meritorious. So long as one may garner from the statute its legislative purpose, and that purpose is within the constitutional power of the legislature, the investigative agency may set its own reasonable guidelines to carry out that legislative purpose. There is no law which we can find, and Respondents cite none, standing for the proposition that the statute must set forth such guidelines. A citizen who believes he has been aggrieved by such guidelines may

always come to the judicial branch to test them for the protection of his rights.

It is the holding of this Court that the establishment of this Commission and the powers delegated to it by the Legislature were not an unlawful delegation of powers.

## DUE PROCESS

There can be no question that, ordinarily, administrative proceedings are held to similar due process requirements of the Constitution as proceedings in a court of law. However, it is also true that there is a distinction between investigations and hearings, which are accusatory or adjudicatory, as compared to those which are purely investigatory. (*See Hannah v. Larch, infra.*)

Generally, due process of law requires that the citizen be given notice of the matter about which he is to be charged or interrogated and that the proceedings be held in a fair and impartial manner. Courts, in this country, have always recognized the impossibility to establish exact standards for due process, but also always demanded that fairness be an indispensible part of the due process guarantee.

On the subject of notice, the statute here in question clearly sets forth the subject matter and the scope of the Commission's investigatory powers. The Chairman of the Commission at and before the two public hearings, mentioned in the findings hereof, made statements concerning the extent of the Delaware County hearings. In view of these facts, we hold that the Respondents had the adequate notice required by the due process requirements.

The topic of due process was the main issue in the case of *Hannah, et al. v. Larch, et al.,* at 363 U.S. 420 (1960). Mr. Chief Justice WARREN wrote the opinion involving an investigation by the Federal Commission on Civil Rights into alleged Negro voting deprivations

in the State of Louisiana. That Commission called a hearing, but before it could convene, officials in Louisiana sought to enjoin the Commission. That Commission had subpoenaed witnesses and also issued subpoenas duces tecum. The lower federal court granted the injunction, finding that under the Commission's rules, the election officials would be denied the right of "apprisal, confrontation and cross-examination." The United States Supreme Court first determined that the Congress intended that Commission to have solely investigatory powers; and that the denial to witnesses of the right of apprisal, confrontation and cross-examination was therefore within the legislative intent. Next, the court had to determine whether or not the Commission's rules were consistent with the due process clause of the Fifth Amendment. The Court found that the function of that Commission was purely investigative and fact-finding and not adjudicative. Because the *Hannah* opinion is so very pertinent to our holding in this case, we quote from it at length: The Court stated:

"It [the commission] does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property. In short, the Commission does not and cannot take any affirmative action which will affect an individual's legal rights. The only purpose of its existence is to find facts which may subsequently be used as the basis for legislative or executive action."

*At page 441:* "The specific constitutional question, therefore, is whether persons whose conduct is under investigation by a governmental agency of this nature are entitled, by virtue of the Due Process Clause, to know the specific charges that are being investigated,

as well as the identity of the complainants, and to have the right to cross-examine those complainants and other witnesses. Although these procedures are very desirable in some situations, for the reasons which we shall now indicate, we are of the opinion that they are not constitutionally required in the proceedings of this Commission.

*At page 442*: " 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used. Therefore, as a generalization, it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding are all considerations which must be taken into account."

*At page 443*: ". . . There is nothing in the record to indicate that such will be the case or that past Commission hearings have had any harmful effects upon witnesses appearing before the Commission. However, even if such collateral consequences were to flow from the Commission's investigations, they would not be the result of any affirmative determinations made by the

Commission, and they would not affect the legitimacy of the Commission's investigative function.

· "On the other hand, the investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings, and if persons who might be indirectly affected by an investigation were given an absolute right to cross-examine every witness called to testify. Fact-finding agencies without any power to adjudicate could be diverted from their legitimate dues and would be plagued by the injection of collateral issues that would make the investigation interminable." Mr. Chief Justice WARREN points out that legislative and executive investigative agencies are as old as the Republic and rarely have witnesses been afforded the procedural rights normally associated with adjudicative proceedings.

*At page 448*: ". . . Undoubtedly, the reason for this distinction is to prevent the sterilization of investigations by burdening them with trial-like procedures."

*At page 449*: "We think it is fairly clear from this survey of various phases of governmental investigation that witnesses appearing before investigating agencies, whether legislative, executive or judicial, have generally not been accorded the rights of apprisal, confrontation or cross-examination."

*At page 487*, Mr. Justice FRANKFURTER, in a concurring opinion, states: ". . . Since due process is the constitutional axis on which decision must turn, our concern is not with absolutes, either of governmental power or of safeguards protecting individuals. Inquiry must be directed to the validity of the adjustment between these clashing interests—that of Government and of the individual, respectively—in the procedural scheme devised by the Congress and the Commission. Whether the scheme satisfies those strivings for justice which due process guarantees, must be judged in the light of

reason drawn from the considerations of fairness that reflect our traditions of legal and political thought, duly related to the public interest Congress sought to meet by this legislation as against the hazards or hardship to the individual that the Commission procedure would entail."

*Also, at page 487*: ". . . Whether the procedure now questioned offends 'the rudiments of fair play,' . . . is not to be tested by loose generalities or sentiments abstractly appealing. The precise nature of the interest alleged to be adversely affected or of the freedom of action claimed to be curtailed, the manner in which this is to be done and the reasons for doing it, the balance of individual hurt and the justifying public good— these and such like are the considerations, avowed or implicit, that determine the judicial judgment when appeal is made to 'due process'."

The present posture of this case in light of the Respondents' refusals to appear before the Commission, affords us no indication as to whether the hearings will be held in a fair manner. In the absence of such an appearance or the making of a record, we are left only with speculation with regard to Respondents' allegations of unfairness. We are, nevertheless, concerned with the extent to which a citizen may be properly subjected to Commission interrogation in the presence of the news media, which under the present public press approach, through the gathering of information for public consumption, include such things as bright klieg lights, newsreel cameras, microphones and floor-cluttering wires. There must exist a point past which the law will refuse to countenance the subjection of a citizen to needless and unfair ridicule and suspicion despite the legislative purposes of the inquiry. *See Jenkins v. McKeithen*, 395 U.S. 411 (1969). This concern is, however, presently academic for the issue is not before us,

in that Respondents have not as yet answered the calls of the subpoenas.

We note in passing, however, that the statute permits public hearings. Neither the Commission nor this Court has the power to restrict the news media from reporting the developments or events occurring at a public hearing. This public information is public property. We must also presume that no official of the Commission intentionally will utter public statements or leak confidential information which will destroy the business, position or reputation of any citizen, until the contrary is proven. That kind of abuse certainly could not be supported as coming within the legislative purpose. Indeed, the opening statements of the Chairman of the Commission should be informative on the scope and purpose of the hearings in question, and should not be interpreted as suggesting the culpability of, or cast a cloud of suspicion on, any witness who may be called, even if not so specifically stated by the Chairman. Common sense dictates that to do otherwise would defeat the legislative purpose. The advisability of public hearings over private hearings is indeed a matter to be left to the discretion of the Commission. To many it might appear that more would be accomplished by the Commission through the use of private hearings. Such an approach would do much to protect the reputations of the innocent. Yet, the decision (public vis-a-vis private) is one of policy and should be made by the Commission. However, here, because of the notoriety already engendered by this case, we will give some judicial direction at the end of this opinion.

The Commission Chairman, its members, its legal counsel and its staff are bidden to strictly guard the constitutional rights of subpoenaed witnesses. Alleged violations of these rights are indeed justiciable, but the burden of proving such violations by the Commission

must rest with the person asserting such violations. On the present state of this record, the instant Respondents have failed to meet this burden.

Our reading of the statute demonstrates to us that this Commission is neither an adjudicatory nor an accusatory body. Its purpose is to investigate and to gather information concerning improper criminal activities (including those in governmental bodies) in this Commonwealth. Its "duty" is the submission of reports, recommendatory in nature, relating to future legislation and to make recommendations to governmental and law enforcement agencies.

We have before us facts quite dissimilar to those of *Jenkins, supra.* In *Jenkins,* the Commission was empowered to gather and present criminal findings of fact, accusatory in nature. That Commission had no specific mandate requiring it to report to the legislature in furtherance of the legislative function. We contrast *Jenkins* with the instant case and find that a portion of this Commission's mandate requires that it submit "a detailed written report of every completed investigation." These reports "may include recommendations for legislative or administrative action." The Commission's power to investigate and convene hearings are the underpinnings of its broader mandate. That mandate is not one of arriving at the determination of an individual's criminal culpability. It is not accusatory. Respondents have failed to show the accusatory nature of the Commission's proceedings.

An investigatory agency need not provide in its subpoena specific notice of the details and the minutae being investigated. What is required is that the subpoena contain the legislative declaration of the Commission's purpose in a manner so as to reasonably disclose the general matters under investigation, thus minimizing the possibility of surprise at the actual hearing. In

other words, there must be a nexus between the call and a valid legislative purpose.

Although we can find no Pennsylvania authority for the proposition that the investigative administrative agency subpoena must contain a notice of the details and minutae under investigation, a witness answering the call of the Commission's subpoena is afforded the right to object to specific questions on grounds of pertinency. *See Barenblatt v. United States, supra.* A witness duly served with a proper subpoena has no right to refuse to answer the call on the basis of a pertinency objection. As Mr. Justice CARDOZO said, speaking as Chief Judge of the New York Court of Appeals in the case of *Edge Ho Holding Corp.*, 256 N.Y. 374, 176 N.E. 537, 539 (1931) : "The powers devolved by the charter upon the Commissioner of Accounts are of great importance for the efficient administration of the huge machinery of government in the City of New York. They will be rendered to a large extent abortive if his subpoenas are to be quashed in advance of any hearing at the instance of unwilling witnesses upon forecasts of the testimony and nicely balanced arguments as to its probable importance. Very often the bearing of information is not susceptible of intelligent estimate until it is placed in its setting, a tile in the mosaic. Investigation will be paralyzed if arguments as to materiality or relevance, however appropriate at the hearing, are to be transferred upon a doubtful showing as to the stage of a preliminary contest as to the obligation of the writ. Prophecy in such circumstances will step into the place that description and analysis may occupy more safely. Only where the futility of the process to uncover anything legitimate is inevitable or obvious must there be a halt upon the threshold." (256 N.Y. at page 381, 176 N.E. at page 539.) Here the Respondents have made no such showing of futility.

As a result of our holding that this Commission is not accusatory, it follows that there is no requirement under due process that the Respondents be represented by counsel as they would be entitled to in a court of law. Here the Commission rules permit each of the Respondents to be accompanied by their counsel who may render to them advice as the questions are asked by the Commission. (*See Hannah, et al. v. Larch, supra.*)

It matters not in an investigatory proceeding that some of the witnesses are interviewed in private prior to a hearing, or that some of the witnesses testify *in camera* or that a witness subpoenaed has not been interviewed prior to the hearing before the Commission. The Respondents need only know that they have been subpoenaed to testify before the Commission in furtherance of its mandated duties.

The Commission is without the power to indict or prosecute. The Commission is given the power, however, to report not only to the Legislature but to law enforcement agencies any information coming before the Commission from which could result criminal actions. It is because of this possibility that each witness is guaranteed the constitutional right to maintain his silence to particular questions whose answers are held to be self-incriminating. These particular objections can only arise after the witness presents himself and objects, as he may under the Commission rules, to any particular questions presented by the Commission. To permit a citizen to refuse to testify or appear at a Commission hearing merely because of the *possibility* that he may be embarrassed by questions asked or that he may be asked questions the answers to which might incriminate him, would be to frustrate and often defeat the purposes of the legislatively created investigatory agency. The courts of this Commonwealth will always

balance a citizen's constitutional rights against the powers of the legislature to investigate; and this Court will be zealous in the protection of a citizen's constitutional rights. This protection can attach only upon the presentation by the subpoenaed witness of credible facts indicating the actual or probable violation of the individual's constitutional rights. Anything less than such a showing leaves this Court powerless to interfere with the discretion of the Commission. Unjustified judicial interference would be violative of the long established doctrine of the separation of powers.

In addition, this Court has said many times since its inception that it will not substitute its judgment for that of an administrative agency of this Commonwealth in discretionary matters. We are bound to follow the law in this Commonwealth which clearly says that this Court may not interfere until an agency has committed a manifest abuse of discretion or committed an error of law. *See Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 572-73, 109 A. 2d 331, 334 (1954).

In summary, we hold that the issuance of the subpoenas was within the specific powers granted to the Commission by the Legislature. The subpoenas issued in this case, though general in their statements, give adequate notice to the Respondents of the nature of the hearing. At this point in the proceedings the Respondents have suffered no deprivation of their due process rights.

## PERTINENCY

Respondents argue lastly that the Commission had the burden to show that the testimony to be elicited from the Respondents was pertinent and materially relevant to the Commission's investigation. We hold that the Respondents are in error on this point. The case law is very clear that the Commission need only prove that its subpoenas were properly issued, and that after

service the proposed witness failed to appear. The burden was then upon the proposed witness to prove that any testimony he may be called upon to present would be neither pertinent nor materially relevant. As pointed out by Professor Davis in his Treatise, *supra,* in Chapter 3 at page 230-31:

". . . all that is now required is that the investigation be for a lawfully authorized purpose, . . .

". . . The standard that guides the scope of a federal court's inquiry into the agency's jurisdiction is whether the information sought is 'plainly incompetent or irrelevant to any lawful purpose' of the agency. . . ."

The opinion by the United States Supreme Court in the case of *United States v. Morton Salt Co.,* 338 U.S. 632, 641-43 (1950) is vital to the disposition of the pertinency question.

The Court there held:

"This case illustrates the difference between the judicial function and the function the Commission is attempting to perform. The respondents argue that since the Commission made no charge of violation either of the decree or the statute, it is engaged in a mere 'fishing expedition' to see if it can turn up evidence of guilt. We will assume for the argument that this is so. Courts have often disapproved the employment of the judicial process in such an enterprise. Federal judicial power itself extends only to adjudication of cases and controversies and it is natural that its investigative powers should be jealously confined to these ends. The judicial subpoena power not only is subject to specific constitutional limitations, which also apply to administrative orders, such as those against self-incrimination, unreasonable search and seizure, and due process of law, but also is subject to those limitations inherent in the body that issues them because of the provisions of the Judiciary Article of the Constitution.

"We must not disguise the fact that sometimes, especially early in the history of the federal administrative tribunal, the courts were persuaded to engraft judicial limitations upon the administrative process. The courts could not go fishing, and so it followed neither could anyone else. Administrative investigations fell before the colorful and nostalgic slogan 'no fishing expeditions.' It must not be forgotten that the administrative process and its agencies are relative newcomers in the field of law and that it has taken and will continue to take experience and trial and error to fit this process in our system of judicature. More recent views have been more tolerant of it than those which underlay many older decisions. Compare Jones v. Securities & Exchange Comm., 298 U.S. 1, 80 L. Ed. 1015; with United States v. Morgan, 307 U.S. 183, 191, 83 L. Ed. 1211.

"The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it too may take steps to inform itself as to where there is probable violation of the law." The Court concluded with the following widely-quoted statement of administrative law authority at 652.

"Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest.

"Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. Federal Trade Comm. v. American Tobacco Co., supra. But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant."

In judicial enforcement proceedings, the person to whom the subpoena is directed has full opportunity to test its validity, and is entitled to have finally determined any legal reason why enforcement should be withheld. The court may consider such questions as authority to conduct the investigation, the power to issue the subpoena, and any constitutional rights and privileges of the witness which he proves will be violated by his appearance at the hearing. Whether a subpoena shall be enforced rests in the judicial discretion of the court. In the absence of a basis or showing that the investigative agency has exceeded its lawful limits, the court has no other alternative but to order the subpoenaed witness to appear at the hearing.

In summary, we hold that the Respondents failed at the outset to sustain their burden of proving that the information sought by the Commission was clearly incompetent, irrelevant or immaterial to any lawful purpose under the statute. In the course of the Commission's hearings any and all questions put to the Respondents are open to the objections of pertinency and relevancy. They will be dealt with at that time. *See*

*Cathcart v. Crumlish,* 410 Pa. 253, 189 A. 2d 243 (1963) ; *Alpha Club v. Liquor Control Board,* 363 Pa. 53, 68 A. 2d 730 (1949) ; *Com. ex rel. Chidsey v. Mallen,* 360 Pa. 606, 63 A. 2d 49 (1949) ; and the recent memorandum opinion of the United States District Court for the Middle District of Pennsylvania in the case of *Dixon, et al. v. Pennsylvania Crime Commission, et al.,* dated February 22, 1972, at Civil Action No. 71-488.

## FUTURE HEARINGS IN THIS CASE

After having stated the result of our research and analysis of the existing law on the subject, we turn to apply our findings and discussion to that law. We are made cautious by the fact that certain of these Respondents were candidates for public office at the General Election just a month subsequent to the hearings to which they were subpoenaed. We cannot help but notice that the sensational news media publicity treatment afforded to the hearings would lead any reasonable man to question the culpability of the persons subpoenaed, or perhaps, even the motives of the Commission. We cannot permit ourselves to forget the basic principle that no matter how much information the Commission may have, every citizen has a constitutional right to a presumption of innocence which covers him like a suit of armor. Never should we permit that armor to be destroyed by a slow process of exposure to rusting by innuendo, rather than an all-out, open battle under the protective fundamental rules of fairness.

Fairness, perhaps, is as elusive of precise definition as the term due process, as already noted herein. However, when we apply the facts of this case to our sense of fundamental fairness, we question the public relations approach by the Commission to the calling by subpoena of these Respondents. There is nothing in this record which justifies a fanfare approach to a

public hearing. Our sense of fairness dictates that when it becomes patently obvious that public relations news releases, or publicity statements, on the calling of specific witnesses, will endanger the reputation of such witnesses, because of their position in society, the Commission should take care to protect the witnesses' rights, and where necessary, privately call them to private hearings. This is not to say that the Commission cannot expose its findings and conclusions upon the completion of its investigation. Quite to the contrary, that is what the Legislature directed. It would be a tragedy for a subpoenaed witness to be given a "badge of infamy" by inference, through public statements made by members of the Commission, in their well-meaning exuberance during an investigation, only to find at the conclusion that the witness was in fact innocent of any wrongdoing, or should not have been called in the first place.

We question the need for any public reference to anyone specifically at any time during an investigation, as coming within the legislative purpose.

It seems to us to be paradoxical for the law to develop in recent years a new body of principles providing for the necessity of due process hearings to protect citizens' rights in their relations with government in many legal fields, such as public welfare and driver's licenses; and then for the law to deny that same due process protection for a citizen caught up in a legislative investigation. We recognize that we cannot change the law of the land, but we can attempt to make straight a path of fairness through the maze of apparent inconsistency. In our Order in this case we will direct the Commission to conduct the hearings involving the testimony of these Respondents in such a way as to meet our sense of fairness, within the framework of the legislative purpose. Nothing will be gained, and the legislative purpose will not be enhanced, by further

staging of sensational public hearings involving these Respondents. So that there will be no mistake we rule that it would be an abuse of discretion to stage public hearings involving these Respondents in the current investigation at issue in this case.

## CONCLUSIONS

1. This Court has jurisdiction under the Appellate Court Jurisdiction Act, Act of July 31, 1970, P. L. (Act No. 223), Section 401(a)(2), 17 P.S. §211.401 (a)(2).

2. The Pennsylvania Crime Commission was created by the Act of July 21, 1968, P. L. (Act No. 235), amending the Administrative Code of the Act of April 9, 1929, P. L. 177, 77 P.S. §§62, 179 and 307.

3. The Commission was established as an administrative agency within the Department of Justice.

4. The Commission in this case is conducting an investigation, under the authority of the above Act, into organized and other criminal activities, their prevention and control; the administration of justice, criminal infiltration in operation of businesses; and the relationships among persons involved in criminal activities, public officials and private associations, in Pennsylvania and, in particular, in the City of Chester, the County of Delaware generally, and surrounding areas.

5. The Commission was acting within its powers and responsibilities in issuing subpoenas to the Respondents.

6. The contents of the subpoenas are sufficiently adequate to come within the purposes of the above statute and contain sufficient notice to the Respondents to meet all of the due process requirements of the Constitutions.

7. Respondents have failed to prove that the information sought by the Commission is incompetent, irrelevant or immaterial to the legislative purpose.

8. Under the terms of the statute the Commission is a purely investigatory agency.

9. The refusal of the Respondents to honor the subpoenas issued by the Commission and to appear at the scheduled hearings as notified was in violation of the statute.

10. All of the constitutional rights of all of the Respondents may be adequately protected and provided at a private hearing to be called within thirty days from the date of the Order of this Court.

Based upon the above analysis, we

## ORDER

AND NOW, this 2nd day of May, 1972, upon consideration of the Petition of the Pennsylvania Crime Commission for a Rule to Show Cause Why John H. Nacrelli, Joseph L. Eyre, Samuel R. Dickey, and Harry A. McNichol Should Not Be Ordered To Testify, and upon further consideration of the Stipulations of Facts submitted by each of the Respondents and the Commission, together with briefs and after argument, it is hereby ordered that the said Respondents shall appear before the Pennsylvania Crime Commission at a time and place to be determined by the Commission within thirty days of the date hereof to be sworn and to answer such questions as may be put to them.

DISSENTING OPINION BY JUDGE CRUMLISH, JR.:

I dissent.

While I agree with the majority in its analysis of the issues involved and its determination that fundamental fairness is an essential ingredient of any government sponsored investigation, I believe that in setting up guidelines to insure that result it has not focused on the investigation which is the subject of the litigation we are here considering. I would insure fundamental fairness in the matter before us by holding

that the subpoenas must be quashed so that these respondents are protected from a wholesale invasion of privacy.

I would not, to borrow language of the majority, transform these hearings into "trial-like proceedings" with an absolute right of cross-examination, but I would require some showing by the investigating authority that there was some causative reason for calling these particular respondents or for that matter any other person, public official or otherwise, who happens to find himself in Delaware County. I cannot agree that the statutory language and the opening statements by the Chairman of the Commission bring into play this vital safeguard. *Gibson v. Florida Investigation Committee,* 372 U.S. 539, 545 (1963), Justice GOLDBERG speaking for the majority, said: "Validation of the broad subject matter under investigation does not necessarily carry with it automatic and wholesale validation of all individual questions, subpoenas and documentary demands."

Not only is the decision in the instant case erroneous in that it fails to protect those respondents but it is even more disturbing because it sets precedent reminiscent of McCarthyism.[1] These guidelines are not binding. The effect of the majority's decision is to countenance an investigation in which, indeed, every person in Delaware County could be subpoenaed.

Ironically, this procedure calls for a contradiction of the basic concept of the administration of justice in the United States by holding a witness up to public ridicule, suspicion and even condemnation without allowing him the slightest notion of the Commission's interest (as in this case) under trappings which rival any Hollywood motion picture or television production. I

---

[1] *American Heritage Dictionary of the English Language,* American Heritage Publishing Co., page 809 (1970), second definition.

can think of no more direct violation of the protection afforded by the Fourth Amendment. In my judgment, such a person is by today's decision of the majority, clearly denied the protection of his right to privacy.

In *In Re Grand Jury Proceedings, Matter of Sister Joques Egan*, 450 F. 2d 199, 200 (1971), it was stated: "We begin with the reminder that the basic purpose of the Fourth Amendment, recognized by countless decisions of the Supreme Court, is to safeguard the privacy and security of citizens against arbitrary invasions by governmental officials. It thus gives concrete expression to a right of the people basic to a free society." Although there are factual distinctions to be found, its rationale is squarely on point. The decision of the majority sanctions such an "arbitrary invasion" of privacy.

To avoid the accusatory condemnation by merely characterizing the proceeding as investigatory, begs the question and does not meet the substantive issue to wit: Does the conduct of this body constitute an unreasonable invasion of privacy? As Chief Justice WARREN said in *Watkins v. U. S.*, 354 U.S. 178, 198 (1957), "We cannot simply assume, however, that every congressional investigation is justified by a public need that overbalances any private rights affected. To do so would be to abdicate the responsibility placed by the Constitution upon the judiciary to insure that the congress does not unjustifiably encroach upon an individual's right to privacy. . . ."

I believe that it is the duty of this Court to control the investigatory conduct of overzealous or irresponsible or politically activated factfinders so that individuals' fundamental rights are not swept aside. Too high a price can be paid for the results to be obtained in the administration of legislatively mandated investigative proceedings. In an attempt to attain the statu-

torily prescribed goals, those charged with this public function must be constantly vigilant to remember that the safeguards which have been erected to insure against untrammeled abuses must not be forgotten in their desire to serve the total public interest.

---

DISSENTING OPINION BY JUDGE ROGERS:

One seeking an English or American precedent for what the Pennsylvania Crime Commission has done here would journey far into history before encountering its like. Judge CRUMLISH in his dissenting opinion has properly referred to the excesses of McCarthyism. But the extravagant charges, invidious implications of wrongdoing and other assaults on the reputations of the victims of that era were soon understood to be the product of one man's distorted conception of disloyalty to Country, although ostensibly undertaken by a subcommittee of the United States Senate. And, being essentially the acts of a single person, those injustices could be and were eventually requited when the offender was brought to book. The perpetrator of the injuries here is the State itself.

The parties have provided us with a stipulation which essentially establishes that the Commission in the course of investigating alleged criminal activities and the relationship thereto of public officials in the City of Chester, Delaware County, conducted interviews and private hearings during August and September 1971. None of the respondents here knew what information was sought or obtained by the Commission nor, under the practices of the Commission, was such information available to them. Nevertheless, some of such information found its way to press, television and radio. None of the respondents was interviewed or invited, summoned, or permitted to participate in the Commission's private hearings. The Commission con-

ducted a public hearing on September 8, 1971 in a large public room of a downtown Philadelphia hotel. Press, television and radio were invited and provided accommodations. The Chairman opened that hearing by stating that the subject matter was protected gambling operations and bailbond racketeering in Delaware County. The Commission scheduled a further public hearing for October 4, 1971 at the auditorium of the Law School of Villanova University, located in Delaware County. The news media specifically and the public generally were notified by the Chairman of the Commission and its attorneys that a purpose of this hearing would be the public examination of the respondents. The respondents were, coincident with this public announcement, subpoenaed to appear ". . . to testify to the truth and give evidence, concerning criminal activities, their prevention and control, the administration of justice, and relationships among persons involved in criminal activities, public officials and private associations, in Pennsylvania."

One of the respondents is Harry A. McNichol, who was and is a Commissioner of Delaware County. He was a candidate for reelection to that high office in the general election held November 2, 1971. His name had never been mentioned in any of the private hearings of the Commission as having any connection whatsoever with any of the activities under investigation. Another respondent, John H. Nacrelli, was a candidate for the office of Mayor of the City of Chester at the same election. The respondents determined to resist the subpoenaes. The Commission informed the news media not only that the respondents had been subpoenaed to appear at Villanova Law School on October 4, 1971, but that they were resisting the subpoenaes and that such resistance was a "delaying tactic." When, after notifying the Commission that an application would be made

to this court to quash the subpoena at a time certain, the respondents' counsel were met in the corridors adjoining our courtroom by press and television photographers obviously on the qui vive by Commission agents and employees. Respondents' counsel were similarly encountered when they appeared at the Villanova Law School Auditorium to protest the proceedings and to advise the Commission that they believed under the law their clients were not required to obey the Commission's subpoenas.

Despite the fact that it was the Commission's usual practice to interview or examine witnesses in private session before conducting a public hearing, despite the fact that none of the respondents had been interviewed, examined privately or informed of what might be expected to be asked of them, and despite the fact that, in Mr. McNichol's case, no one had connected him with any alleged irregularities, these respondents were summoned for public examination before the specially invited and accommodated news media with photographic implements of every kind, to testify to "[c]riminal activities . . . and relationships among persons involved in criminal activities, public officials and private associations, in Pennsylvania."

The first section of the first Article of the Constitution of Pennsylvania provides: *"All men* are born equally free and independent, and *have certain inherent and indefeasible rights, among which are those* of enjoying and defending life and liberty, *of acquiring, possessing and protecting* property and *reputation,* and of pursuing their own happiness." (Emphasis supplied.)

The respondents are thus accorded a constitutional right to possess and protect their good names, as firm as their right to enjoy and defend life and liberty and to hold and safeguard property. *Meas v. Johnson,* 185 Pa. 12, 39 A. 562 (1898). Their right in this regard is

equally protected from State invasion by the Fourteenth Amendment to the Constitution of the United States, where it is expressed in negative terms: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law. . . ." The requirement of due process extends to administrative proceedings. *Commonwealth ex rel. Chidsey v. Mallen,* 360 Pa. 606, 63 A. 2d 49 (1949) ; *Taylor v. Weinstein,* 207 Pa. Superior Ct. 251, 217 A. 2d 817 (1966). Where the administrative body has adjudicatory powers, the party affected must be apprised of the nature of the hearing and be afforded the opportunity to offer evidence and to examine that of the opposition. *Ashbury Truck Co. v. Railroad Commission of the State of California,* 52 F. 2d 263 (1931), *aff'd* 287 U.S. 570, 53 S. Ct. 94 (1932). Where, as here, the agency of government is investigatory, a less stringent but no less essential requirement obtains. The procedures must be fundamentally fair.

In my view, the procedures of the Commission in this case were grossly unfair, and violative of the Constitutions of this State and of the United States.

What happened here flowed naturally enough from the legislation creating this Commission which is markedly different from those governing investigatory bodies having similar purposes created in other jurisdictions, including the bodies whose procedures were reviewed and found adequate in the cases relied upon by the Commission here, *Hannah v. Larche,* 363 U.S. 420, 80 S. Ct. 1502 (1960), and *Zicarelli v. New Jersey State Commission of Investigation,* 55 N.J. 249, 261 A. 2d 129 (1970), *prob. juris. noted,* 91 S. Ct. 916 (1971).

The Pennsylvania Crime Commission is in the Department of Justice. Section 202 of The Administrative Code of 1929, Act of April 9, 1929, P. L. 177, as amended, 71 P.S. §62. It consists of four Commissioners, all

appointed by the Governor, and the Attorney General as Chairman. Section 469(a) of The Administrative Code of 1929, 71 P.S. §179(a). Hence all of the members are appointed by the Governor. The Attorney General is Chairman. The Chairman appoints and fixes the compensation of an executive director, and of such other employees as he finds necessary. By Section 923(3) of The Administrative Code of 1929, 71 P.S. §307(3), the Commission is given power "[t]o investigate crime generally, and . . . specifically but not limited to any relationship between any combination of persons involved in the commission of crimes on one hand, and any government or political unit. . . ." By the same section of the Code, 17 P.S. §307-7(9), the Commission is empowered to require the attendance and testimony of witnesses ". . . relative to any investigation which the commission may conduct . . . ." It is authorized "[t]o compile and publish rules for the calling of meetings and to carry out the provisions of this act. Such rules may be altered or amended at any time but shall not take effect until filed with the Secretary of State." 71 P.S. §307-7(10). Our research has failed to unearth another instance of a board, commission or body charged with the investigation of criminal activities for legislative use having the following characteristics of the Pennsylvania legislation: (1) appointment of all members by the executive, (2) the employment and compensation of all staff by the Attorney General appointed by the Governor, (3) the total absence of statutory provision for minimum protection of prospective witnesses, and (4) the total commitment to the investigatory body of the power to establish rules of procedure, including those affecting witnesses.

The Commission contends that its subpoenas here requiring the respondents to appear and testify publicly at a well advertised hearing, to which the news me-

dia were specially invited, about "crime in Pennsylvania" without knowledge of what aspect of crime in Pennsylvania would be examined, or on what subjects they were supposed to give evidence, are enforceable on the authority of two cases. The first of these cases, *Hannah v. Larche, supra,* was an attack on two rules of the Federal Commission on Civil Rights; one providing that the identity of persons submitting complaints to the Commission need not be disclosed to persons subpoenaed to testify, and the other denying the right to cross-examine witnesses appearing before the Commission. The plaintiffs in that suit sought to enjoin the Commission from compelling their testimony. The hearing sought to be forestalled was scheduled *after* the Commission had interviewed the plaintiffs and *after* the plaintiffs were asked to and refused to answer written interrogatories *based upon complaints* received by the Commission that the plaintiffs had, as registration officials, denied voting rights. The difference between the treatment accorded the plaintiffs there and the respondents here in the light of fundamental fairness is in the order of the difference between the trial of John Thomas Scopes and the St. Bartholomew's Day Massacre. It is not a question here of seeking the identity of accusers or of the asserting the right of cross-examination. Here, admittedly in the case of Mr. McNichol and so far as we know in the case of other respondents; there *are* no accusers. These respondents complain that they are compelled to appear before television, press and radio as persons presumably knowledgeable concerning crime in Pennsylvania without interview, private interrogation, or notice of what subjects they are to be examined upon.[1] To contend, for

---

[1] The Commission contends that its practice of announcing the subject matter at the opening of the hearing is sufficient notice and that neither by the subpoena, as is required in the statutes of

instance, that Mr. McNichol's reputation would not be sullied by being required to appear and attempt to answer questions concerning subjects about which he has no prior knowledge and concerning which this Commission has no reason based upon the *testimony of others* to believe he has knowledge, is worse than specious. The act of calling him implied what the Commission has been forced in this litigation to admit to be false, that is, that Mr. McNichol has been connected by others with the alleged crimes under investigation. And if Mr. McNichol, a County Commissioner, why not other candidates who happen to reside in a community where the Commission believes that crime involved with local politics may exist? Why not the County judges running for election or a candidate for Governor or indeed a candidate for the Presidency of which there are a plethora now passing in our midst? Amazingly, the Commission's answer is, indeed why not? Both in its brief and in argument before this court the Commission asserts that it may, without infringing any Constitutional right of the subject, subpoena anyone it desires to bring before it whether or not it has any reason based on previous investigation to believe that the person subpoenaed has knowledge or information concerning the inquiry, and that it may do so without any prior contact with the proposed witness. It contends that it may do this to a public person coincident with an invitation to the news media to report and photograph the witness' appearance before its inquisitors. This is not, and never has been the law in any jurisdiction adhering to the Bill of Rights and is so violative of fundamental fairness that, as pointed out *infra,* the statute which leads a Commission of State

---

other jurisdictions, or by any other prior means are the respondents entitled to know even of the general nature of the inquiry. I believe this practice to be grossly unfair.

government to believe that it has such power must be examined with great circumspection.

Nor is *Zicarelli v. New Jersey State Commission of Investigation, supra,* authority for the constitutionality of what this Commission has done. The Commission's use of this case in brief and argument is disingenuous in the extreme, as the following excerpt from Judge WEINTRAUB'S opinion clearly demonstrates:

"In other words, the S.C.I. can respect the demands of due process without disobeying the letter or spirit of the statute. . . .

"We add that nothing occurred in the present matter which suggests the S.C.I. intends to transgress those limits. *The S.C.I. met the provisions of the Code of Fair Procedure, L. 1968, c. 376, N.J.S.A. 52:13E-1 to 10.* A copy of that statute was served upon each appellant with the subpoena, and *the subpoena contained a sufficient statement of the subject of the investigation.* N.J.S.A. 52:13-E-2. The right to have counsel present and to receive his advice, N.J.S.A. 52:13-E-3, was respected. *The hearing was private. There has been no trace of a purpose to deny due process.*" (Emphasis supplied.) There is no Code of Fair Practice in Pennsylvania. The Pennsylvania Commission's rules are not equivalently protective and such as they are, are subject to rescission by the Commission almost without notice. Whereas the subpoena in *Zicarelli* stated precisely the subject of the inquiry, the instant subpoenas ask that the witnesses give evidence on "crime in Pennsylvania." Far from a private hearing, these respondents are summoned to a college campus to confront an intimidating array of reporters, photographers and television cameras. In my view there is here demonstrated a clear purpose not only to deny due process but, without reason in the public interest, to destroy the good names and the public careers of such of the respondents as may be public officers.

Not only are *Hannah v. Larche* and *Zicarelli v. New Jersey State Commission of Investigation,* factually inapposite, the statutes of the jurisdictions there involved provided due process protections. In *Hannah v. Larche,* the investigation was being pursued under the Civil Rights Act of 1957. Section 203(a) of that Act, for example, required that if the Commission determined that evidence or testimony might tend to degrade or defame any person such evidence should be taken in executive session. This protection has indeed been broadened since. *See* 42 U.S.C.A. §1975a(e). Other rights were and are accorded by the Civil Rights Act but not afforded by the Pennsylvania Commission's rules, which we will not detail because they would overburden this opinion.[2]

As for *Zicarelli,* the State of New Jersey had and has a Code of Fair Practice. 52 N.J.S.A. §52: 13-#-1 to -10. By Section 2 the witness is to be given a general statement of the subject of the investigation. Other sections of the Act plainly suggest that, as happened in *Zicarelli,* public hearings should be called only after witnesses had been examined at private hearings. New York has also provided the protection of a Fair Hearings Act, incorporated in its Civil Rights Law and substantially similar to the New Jersey Act. N. Y. Consol. Laws Service, Civil Rights Act, §73. By contrast, Pennsylvania has provided no such protections. The Crime Commission Act simply gives the Commission the power to subpoena and the authority "[t]o compile and publish rules for the calling of meetings. . . ."[3] 71

---

[2] For instance, the witness may be additionally examined by his own counsel. Not so under this Commission's rules which permit counsel to advise but not "otherwise participate in the hearing."

[3] Query: Does the power to make rules concerning meetings confer the power to make rules concerning hearings and the rights of witnesses?

P.S. §307-7. The Pennsylvania Commission has promulgated rules. These rules are "non-rules" in the true Orwellian sense. Hearings may be closed or open as the Commission may direct. The Commission may and it does release to the press information received at closed hearings as it sees fit.[4] The hearings may be conducted by any staff member; the presiding officer may in his sole discretion admit evidence and permit, refuse to permit, interrupt and terminate any statement made by a witness; anyone deemed by the Commission to have information may be summoned, as may his records; the papers may be retained and copied; subpoenas need not disclose the subject of the inquiry; and finally the rules may be amended and rescinded at any time. The latest version of these rules is to be found in Volume 1, Number 77 of the Pennsylvania Bulletin and are instructive reading for a draftsman who might desire to provide the semblance while avoiding the reality of any restraint upon the activities of an administrative body.[5]

I would therefore hold that the actions of the Commission here were so lacking in due process that these subpoenas should not be enforced by this court. I would also hold that the Crime Commission Act and the Rules of this Commission, separately and in combination, are unconstitutional as empowering the Executive to deprive citizens of this Commonwealth of their constitu-

---

[4] Such disclosure is specifically prohibited, under serious penalties, by the New Jersey and New York legislation.

[5] It is interesting to note that this version of the Rules was promulgated without the notice provided for by the Commonwealth Documents Law, Act of July 31, 1968, P. L. , No. 240, 45 P.S. §1101. The Commission claims exemption on the grounds that the subject matter is agency "procedure or practice." In this writer's view, the Legislature did not intend agency rules affecting citizens rights to procedural due process to escape prior public scrutiny.

594

tional right to liberty and reputation without due process of law.

I agree with Judge CRUMLISH's dissenting opinion based upon the Fourth Amendment. I would add to his authorities *Annenberg v. Roberts,* 333 Pa. 203, 2 A. 2d 612 (1938), which, despite the animadversions of the Commission, is still the law of Pennsylvania.

I dissent.